Case No. 3 : 05-cv-0014-jws                                    Howard Hughes

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3

4   HOWARD HUGHES,

5              Plaintiff,              COPY

6       vs.

7   PURCELL SECURITY, et al.,

8              Defendant.

9   _____

    Case No. 3:05-cv-0014-jws

10

11

12

13

14          DEPOSITION OF HOWARD HUGHES

15             Taken May 4, 2006

              Commencing at 9:00 a.m.

16

            Volume I - Pages 1 - 100, inclusive

17

18

19          Taken by the Defendant

                    at

20             PERKINS COIE

            1029 W. Third Av., Suite 300

21          Anchorage, AK   99501

22

23

    Reported by: Susan J. Warnick, RPR

24

25

EXHIBIT 7

PAGE 1 of 26

**Page 2**

1  A P P E A R A N C E S
2  For Plaintiff:
3      IN PROPRIA PERSONA
       BY: Howard Hughes
4      7100 Stella Place, #1
       Anchorage, AK 99508
5
6  For Defendant - Purcell Security & APA:
7      PERKINS COIE
       BY: Jacob Nist
8      1029 West Third Avenue
       Suite 300
9      Anchorage, AK 99501
       (907) 279-8561
10
   For Defendant - MOA:
11
       MUNICIPALITY OF ANCHORAGE
12     Assitant Municipal Attorney
       BY: Mark A. Erischek
13     632 W. 6th Av., Suite 730
       Anchorage, AK 99501
14     (907) 343-4545
15
   Taken by: Susan J. Warnick, RPR
16
17  BE IT KNOWN that the aforementioned deposition was taken
18  at the time and place duly noted on the title page, before
19  Susan J. Warnick, Registered Professional Reporter and
20  Notary Public within and for the State of Alaska.
21
22
23
24
25

**Page 3**

1              P R O C E E D I N G S
2              HOWARD HUGHES,
3   called as a witness herein, being first duly sworn to
4   state the truth, the whole truth and nothing but the truth
5   by the Notary, testified under oath as follows:
6              EXAMINATION
7   BY MR. NIST:
8   Q   Good morning, Mr. Hughes.  My name is Jacob Nist.  I
9   represent the Anchorage Parking Authority and Purcell
10  Security.
11      Have you ever had your deposition taken before?
12  A   No.
13  Q   Well, this is a deposition.  Our court reporter is
14  writing down everything that we say, so it can be used in
15  court later on, and I just ask you questions and you
16  answer the questions truthfully.  If you don't understand
17  a question, please let me know.  I'll try to rephrase it.
18      And it's important to speak audibly, since she's
19  writing down everything we say.  It makes it difficult for
20  her if you nod or shake your head or something like that,
21  something that is not audible.
22      And I will assume that you understand my
23  question unless you tell me you don't.  Does that sound
24  fair?
25  A   Yes, it does.

**Page 4**

1   Q   Okay.  Great.
2       We may need to take breaks throughout the day,
3   so if you need a break, let me know.  We can certainly
4   take a break.  That won't be a problem.
5   A   Okay.  Can you tell me how long you think this is
6   going to take?
7   Q   It depends largely on what you have to say.  If you
8   have any -- I have seen these things so fast, and I have
9   seen these go all day, so it really kind of depends on
10  your responses.
11      And just for the record, can you give us your
12  first, middle and last name?
13  Q   My name is Howard Hughes.  Howard L.  Lance is my
14  middle name.
15  Q   And have you ever had a different name?
16  A   No.
17  Q   What is your Social Security number?
18  A   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.
19  Q   And when were you born?  What is your birth date?
20  A   December 7, 1956.
21  Q   And, let's see, where -- what is your address now?
22  Where do you live?
23  A   7100 Stella Place, number one, Anchorage, Alaska
24  99508.
25  Q   And we met previously.  As I understand it, that is

**Page 5**

1   your uncle's place?
2   A   Yes.
3   Q   Are you currently married?
4   A   No.
5   Q   Have you ever been married?
6   A   No.
7   Q   Other than your uncle, is there anybody else you live
8   with?
9   A   No.
10  Q   Can you describe briefly for us your educational
11  background?
12  A   What does all this have to do with this case?
13  Q   I'm just trying to learn more about you, sir.
14  A   No, you don't need my educational background and all
15  that.
16  Q   Well, the judge may feel somewhat differently about
17  that, but we will deal with that at a different time.
18      Can you tell us what you do for a living, sir?
19  A   I'm unemployed.
20  Q   And how long have you been unemployed?
21  A   About a year.
22  Q   And what were you doing before that?
23  A   I do seasonal work.  Sometimes I do construction work
24  in the summertime.
25  Q   Is it fair to say that during the winter you kind of

EXHIBIT 7
PAGE 2 of 26

Case No. 3 : 05-cv-0014-jws

Howard Hughes

Page 6

1 take it easy, and then you try to find construction work
2 during the summertime?
3 A    Yes.
4 Q    And what kind of construction?
5 A    Anything I can get.
6 Q    Do you have a specific employer that you typically
7 use?
8 A    No.
9 Q    You just kind of go through the want ads when it gets
10 close to construction season?
11 A    I just know a lot of people.
12 Q    So, this all revolves around -- this case, as I
13 understand it, all revolves around an incident at the bus
14 station; is that correct?
15 A    Yes.
16 Q    And do you remember when?
17 A    January 28, 2004.
18 Q    And how long had you been riding the bus?
19 A    Years.
20 Q    Do you usually drive more or ride the bus more?
21 A    Usually ride the bus.
22 Q    Do you know a lot of people down at the bus station?
23 A    I know a lot of people in Anchorage.
24 Q    Do you usually see people at the bus station that you
25 know?

Page 7

1 A    Yes.
2 Q    Okay.
3 A    Sometimes.
4 Q    Did you know anybody at the bus station who was there
5 during this January 28, 2004 incident?
6 A    Yes.  I knew a couple of people there.
7 Q    Okay.  Who?
8 A    One is named Russell Dunkin (ph) and a few other
9 people.  I can't really remember.
10 Q    But you remember Russell Dunkin was there?
11 A    Russell Dunkin.  The young lady that approached me, I
12 don't know her name.  The lady that walked up to me and
13 showed me the ban papers, I don't know her name.  I think
14 it was something like Diane.  I have been researching for
15 her.
16 Q    Before you got to the bus station, what were you
17 doing that day?
18 A    I had been to Job Center.
19 Q    What Job Center is that?
20 A    Fourth and Gambell.
21 Q    What were you doing there?
22 A    I sent a fax from Job Center.
23 Q    What kind of fax?
24 A    A fax to an insurance company, Northwest Insurance.
25 Q    Is this for automobile insurance?

Page 8

1 A    I had been in an auto accident, yeah.
2 Q    Did it wreck your car?
3 A    No, I was riding.  I was a passenger.  I was working
4 snow removal.
5 Q    So was this, like, a workers' comp claim?
6 A    Right.  Exactly.
7 Q    Have you ever sued anybody other than in this
8 lawsuit?
9 A    No.
10 Q    Now, as I understand it -- well, how long had you
11 been at the bus station before this incident occurred?
12 A    15, 20 minutes.
13 Q    After 15 or 20 minutes, what happened?
14 A    I was standing there by myself at the door.  I mean,
15 right by the door, waiting on my bus, and a young lady
16 walked up to me and showed me the ban paper.  The
17 picture -- paper said banned and it had her picture on it,
18 and it said, banned, and I'm sitting there.  I don't know
19 why she stopped me.  I mean, why she stopped and said
20 something to.  Me, you know, I don't know her, but she was
21 just showing me the picture, and I was reading it, and the
22 security walked up and told her she had to leave.  I
23 handed her paper back.
24          Well, in the -- well, Russell Dunkin had walked
25 up and was trying to see the paper also, and security

Page 9

1 walked up and told her she had to leave.  I handed the
2 paper back.  She asked Russell Dunkin what bus he was
3 waiting for, and he turned around and walked off from her.
4 Then she turned to me.
5 Q    Let's just hold off there.  This young lady with the
6 ban paper work, they told her to leave?
7 A    Yes, she told her to leave, right.  She had to leave.
8 They told her she had to leave.
9 Q    Did she leave?
10 A    Did I leave?
11 Q    No.  Did she actually leave?
12 A    Yeah, she walked out, yeah.
13 Q    And Russell Dunkin, he was interested in seeing this
14 paperwork as well?
15 A    Right.
16 Q    And do you know why he left after she asked --
17 A    He walked out of the door.  He didn't say nothing to
18 her.  He just walked out the door.
19 Q    Have you ever talked to him about this?
20 A    Yeah, we talked about it.
21 Q    Did he say why he walked out the door?
22 A    I guess he didn't want to be bothered with it.
23 Q    Was he there waiting for a bus?
24 A    I have no idea.
25 Q    When was the last time you talked to Russell Dunkin?

Case No. 3 : 05-cv-0014-jws

Howard Hughes

**Page 10**

1  A   It's been a while.

2  Q   Would it be, what, more than six months or less than

3  six months?

4  A   I think he is incarcerated.

5  Q   Do you know what for?

6  A   No.

7  Q   This young lady, does the name Donna Katie Edwards

8  ring a bell to you?

9  A   I was thinking Diane, but I think her name was Donna,

10  yeah.

11  Q   And when we met earlier, you said that she was -- she

12  had started dating a friend of yours; is that right?

13  A   Right.

14  Q   Who is your friend?

15  A   Only -- I can't remember his last name.  I only

16  remember his first name is Keith.

17  Q   And do you know how to get a hold of Keith?

18  A   Possibly.

19  Q   Do you have his phone number?

20  A   No.

21  Q   Do you have his address?

22  A   No.  I just see him around.

23  Q   And how did you and Keith, like, see each other out

24  at a bar or did you see each other at each other's houses?

25  A   No, I just see him in passing.

**Page 11**

1  Q   How do you know Keith?  Have you guys been friends

2  for a long time?

3  A   Yeah, kind of, yeah.

4  Q   Did you have guys grow up together?

5  A   No, no.

6  Q   Was that the first time that you had met Donna Katie

7  Edwards?

8  A   I had seen her, yeah.  The first -- yeah, we never

9  talked.  I had seen her before.  Never talked to her

10  before.

11  Q   That was the first time you had ever talked to her?

12  A   Think so.

13  Q   Have you talked to her since then?

14  A   Yes.

15  Q   When?

16  A   I think it's kind of irrelevant, but I don't, you

17  know, I talked to her a couple of times, but it was just

18  in brief, in passing.

19  Q   Would it be more than six months ago, less than six

20  months ago?

21  A   Less than six months.

22  Q   You talk to her about this case at all?

23  A   No.

24  Q   Did you ask her if she would be willing to testify

25  for you?

**Page 12**

1  A   No.

2  Q   Did you tell her that you were suing --

3  A   No.

4      MR. NIST:  Let's mark this as an exhibit.

5      (Exhibit 1 marked.)

6  BY MR. NIST:

7  Q   Mr. Hughes, you have been handed what's been marked

8  as Exhibit 1.  It's a black-and-white photograph and has a

9  lady on it.  Do you recognize this lady?

10  A   Yes.

11  Q   Is that Donna Katie Edwards?

12  A   Yeah.  That's who I know -- that's the lady I know

13  that walked up to me and handed me the ban paper.

14  Q   And there is actually a couple of different ban

15  statements attached to Exhibit 1.

16      If you look at the second page, it's dated

17  November 13, 2003.  It says soliciting for prostitution on

18  the property, causing a disturbance, and she had a crack

19  pipe on her.  Do you know if that is true or not?

20  A   I don't have no idea.  What does it matter to me?

21  Q   And turn to the first page, and that one is dated

22  January 28, 2004, and that says that she would be observed

23  soliciting for prostitution, and that she would perform a

24  sex act for money because she needed money for the bus,

25  and she had cigarettes and she was under age.

**Page 13**

1      Do you know if that is true or not?

2  A   No.  Once again, what does it have to do with me?

3  I'm not into -- it's her personal business, not my

4  business.

5  Q   You haven't talked to her about that at all?

6  A   No.  I had not even an idea that's what happened.

7  Q   Do you understand that she's been convicted for

8  sexual abuse of a minor?

9  A   No, I didn't understand that.  Never knew it.  Never

10  heard it before until now.

11  Q   So you were talking to this girl and somebody

12  approached you.  And who was that?

13  A   Officer Miller.

14  Q   How do you know her name is Officer Miller?

15  A   It was on her badge.

16  Q   Do you understand why Officer Miller might want to

17  question people Donna Katie Edwards was talking to after

18  she had been banned?

19  A   Not -- I understand it now, why she might have, you

20  know, but I think Officer Miller knew what she was doing

21  -- I mean, she knew she came and handed me a piece of

22  paper like this (indicating).  I don't -- with her picture

23  on it.  I don't think that would lead her to believe she

24  was soliciting me in any kind of way.

25  Q   Okay.

4 (Pages 10 to 13)

EXHIBIT 7
PAGE 4 of 26

Page 14

1  A   We only -- I mean, we talked a matter of maybe 10 to
2  15 seconds before Officer Miller told her she had to
3  leave.  You know, it wasn't -- you know, Officer Miller
4  saw I was only just looking at the paper, you know.
5       (Exhibit 2 marked.)
6  BY MR. NIST:
7  Q   Mr. Hughes, you have been handed what's been marked
8  as Exhibit 2.  Do you recognize this document?
9  A   No.
10 Q   You have never seen it before?
11 A   No.
12 Q   Well, I'll represent to you that this is a code of
13 conduct at the bus station.  It comes out in a little
14 pamphlet that has been distributed around the bus station.
15      Are you aware that there is kind of a pamphlet
16 talking about the rules of the bus station?
17 A   Not really, no.  I mean, I knew there is rules in any
18 public facility like that, you know.
19 Q   But as to this particular bus station, you weren't
20 aware that there was any kind of rules --
21 A   I have never seen anything like this before.  I don't
22 think it's posted anywhere.  I have never seen it posted
23 anywhere or anything like that.
24 Q   Do you have any reason to believe that this isn't the
25 code of conduct for the bus center?

Page 15

1  A   I have no reason to believe that.
2  Q   Do you have any reason to believe that this isn't
3  created by the Municipality of Anchorage?
4  A   No.
5  Q   Let's see, if you go down -- down to number eight?
6  A   Uh-huh.
7  Q   It says there is prohibition against swearing, using
8  sexually explicit or abusive language and being loud or
9  discourteous.  Did I get that right?
10 A   I see that, yeah.
11 Q   Do you have any problem with that generally as a rule
12 at the bus station?
13 A   No.
14 Q   Do you agree if somebody was swearing, using abusive
15 language, or being loud or discourteous, that that would
16 be a good reason to ban them from the bus station?
17 A   No.
18 Q   You don't agree with that?
19 A   No.  Depends on the situation.
20 Q   Under some situations it might be a good --
21 A   Yeah, you know.
22 Q   What kind of situations would make a difference in
23 your mind?
24 A   If a person just standing there swearing and cussing,
25 you know, and they were asked to stop or something like

Page 16

1  that, then they refuse, then, yeah, that would be, you
2  know.
3  Q   That would be a good reason to --
4  A   Right.
5  Q   -- ban them?
6  A   Yeah.  But if person is just standing there, not
7  doing nothing, you know, not bothering a sole, by himself,
8  like I was, if that's what you're trying to imply.
9  Q   I'm not trying to imply anything.
10 A   Okay.
11 Q   So I'm clear about this, you're saying that at the
12 bus station that day, you weren't swearing or using
13 abusive language or being loud or discourteous?
14 A   Not until I was treated disrespectfully.
15 Q   Down on number 18, see where it says no loitering
16 there?
17 A   Right.
18 Q   Do you have any problem with that as a rule for the
19 bus station?
20 A   No.
21 Q   Is it true that there is a problem with homeless
22 people hanging out at the bus station just because it's a
23 warm place?  Have you ever seen it happen, let me ask you
24 that?
25 A   Sure.

Page 17

1  Q   Do you think that's what the bus station is there
2  for, is for a warm place for homeless people to hang out?
3  A   No.  But it happens.
4  Q   It happens?
5  A   Sure, it does.
6  Q   Why do you think that is?
7  A   Well, middle of January, I mean, the end of January
8  and it's probably about 20, maybe, almost 30 below
9  outside, you know, you're going to have people that is in
10 there that is not there just to catch a bus.  They are
11 there to warm up.  You know what I'm saying?
12 Q   Yeah.
13 A   They don't have to be homeless to do that either, you
14 know.
15 Q   Sure.  Just so I'm clear, which bus station are we
16 talking about?
17 A   I think 6th and G.
18 Q   Sixth and G?
19 A   I think so.
20 Q   Is that the one that has the parking garage attached
21 to it?
22 A   Right.
23 Q   Downtown there?
24 A   Right.
25      (Exhibit 3 marked)

Case No. 3 : 05-cv-0014-jws                                    Howard Hughes

**Page 18**

BY MR. NIST:

1  Q   Mr. Hughes, you have been handed what's been marked
2  as Exhibit 3. Have you ever seen this document before?
3  A   No, I haven't.
4  Q   Well, I'll represent to you that this is Officer
5  Miller's report of the incident between her and yourself.
6  I would just like to go through it briefly and tell me
7  what in it that you disagree with.
8  A   Okay.
9  Q   First line says, "At about 1736 we released a woman
10 from the office after banning her." I think that she
11 means Donna Katie Edwards. And then says that she
12 observed her through the glass talking to two men behind
13 the phone booth.
14       Do you have any reason to disagree that Donna
15 Katie Edwards was talking to you about 5:36 p.m. on
16 January 28?
17 A   Right.
18 Q   Does that sound right to you?
19 A   That sounds right.
20 Q   Then it says that Officer Miller left the office and
21 told her to leave, and I think you have described that?
22 A   Uh-huh.
23 Q   So you're not disputing that?
24 A   No.

**Page 19**

1  Q   And, let's see, "After instructing her to leave the
2  transit center, I recognized one of the individuals as
3  someone who had been loitering around for at least an hour
4  and a half. I proceeded to ask him what bus he was
5  catching, and he replied he wasn't getting on a bus and he
6  ran out the door."
7       Is that Russell Dunkin?
8  A   I don't know how long Russell Dunkin had been there.
9  Q   Okay.
10 A   Okay. She did ask him if he was catching a bus.
11 Q   Okay.
12 A   He didn't run out the door; he walked out of the
13 door.
14 Q   Did he say he wasn't catching a bus?
15 A   No, I didn't hear him say that.
16 Q   Do you think he might have?
17 A   I don't know. No, I don't think he said that. He
18 just turned and didn't say a word to her.
19 Q   Turned, didn't say a word, and walked --
20 A   He didn't say a word. Didn't say a word. He just
21 acted like she didn't say anything.
22 Q   And then it says she asked the other man, who was
23 Mr. Hughes, which bus he was catching.
24 A   Right.
25 Q   Did she ask you which bus you were catching?

**Page 20**

1  A   She sure did.
2  Q   Then it says, "Why do I have to tell you?"
3  A   That's not what I said.
4  Q   What did you say?
5  A   I said bus 45.
6  Q   You said bus 45?
7  A   Right.
8  Q   And so she says that you told -- she told you that
9  she needed to know to make sure that there was no
10 loitering in the transit center. And so, did she say
11 that?
12 A   No.
13 Q   Then she says that you said that you had only been
14 there for half an hour and that you don't have to catch
15 your bus yet?
16 A   No, that's not what I said.
17 Q   You deny saying that?
18 A   Yes. At that time, that is not what I said.
19 Q   At that time?
20 A   At that time, that is not what I said.
21 Q   You said that some other time?
22 A   I told her, when she told me -- she told me -- she
23 said, you have been here over two hours, you need to leave
24 the center; and I said -- she asked me what bus I was
25 catching; I said 45. She said you have been here too

**Page 21**

1  long, you can catch that bus right there. I looked up, it
2  was bus 2, where's no where near 45.
3  Q   So I want to be clear be this. Your testimony is
4  that she came up to you and asked you what bus you were
5  getting at, and then you told her bus 45?
6  A   Right.
7  Q   And then she says you should -- she just picked a bus
8  at random?
9  A   Yes.
10 Q   And she said that you should catch that bus?
11 A   Right. Because I had been there too long. I had
12 been in the center too long. I had been there longer than
13 two hours.
14 Q   Because you had been in there longer than two hours?
15 A   That was her exact words. You have been in here over
16 two hours, you need to leave the center.
17 Q   So she said, you have been here longer than two hours
18 and you need to leave the center and you need to catch and
19 she looked up --
20 A   She said you can catch that one right there.
21 Q   So when Officer Miller said that, what did you say?
22 A   Well, I said -- because -- the reason I said what I
23 said is because I seen Officer Miller in her actions and
24 how cocky she was and how disrespectful she was, and then
25 when she disrespected me, I told her, you need to get the

Page 22

1   fuck out of my face. That is exactly what I told her.
2   Q   You saw her being discourteous to others?
3   A   Yes.
4   Q   Who?
5   A   Well, I saw her being discourteous to Russell Dunkin.
6   I also saw her being discourteous to another man when he
7   walked -- another man by the name of George. I don't know
8   his last name, but that's why -- I think he is the reason
9   that -- I think he told me that she asked him if he had
10  been solicited by this woman, Donna.
11  Q   Donna Katie Edwards?
12  A   Yeah. He is an older black man.
13  Q   So who told you this?
14  A   George did. I don't know his last name. He just
15  said that -- he said it. He said it and he kept going,
16  you know, and I haven't seen him since then either.
17  Q   Okay.
18  A   It was -- it just seemed funny to me that why, you
19  know, I couldn't figure out -- well, you know, why she
20  came at me the way she came at me. I didn't appreciate
21  it.
22  Q   I'm just trying to get what happened with George
23  here.
24  A   Right.
25  Q   So George told you that Officer Miller came up to him

Page 23

1   and was asking --
2   A   I seen her when she walked up to him, but I didn't
3   know what she had said, you know.
4   Q   And so George later told you that she was asking if
5   Donna had solicited George?
6   A   Right.
7   Q   Did George say that she had or not?
8   A   He said she didn't.
9   Q   When you say "soliciting," you're talking about for
10  prostitution?
11  A   Yeah. Something like that, yeah, I guess. That's
12  what she said, propositioned. She just said
13  propositioned. I assume that's what she meant.
14  Q   So you thought that was discourteous to George?
15  A   I thought it was discourteous -- no, not discourteous
16  to George. I thought it was discourteous to me and
17  Russell. Yeah, the way she came at me and Russell, I
18  thought was discourteous, you know.
19  Q   So what was discourteous about asking Russell which
20  bus he was catching?
21  A   Just the way and -- the manner she said it, and I
22  knew it was only because he was standing there reading
23  that paper with me. She didn't go up to anybody else.
24  It's 5:00 in the afternoon. People getting off work,
25  place is over 200 people every where. She didn't ask

Page 24

1   anybody else what bus they were catching.
2   Q   Had you seen Donna Edwards talking to anybody else?
3   A   No.
4   Q   So did you think it was discourteous to you to ask
5   you which bus you were catching?
6   A   No, not discourteous to ask me which bus I was
7   catching, no.
8   Q   Do you think she should be doing as part of her job?
9   A   I mean, if you walk up to each and every individual
10  and ask them what bus they were catching, you know. You
11  know, I don't think she should just be selective. I think
12  she was just being selective. To me, in a period of four
13  to five minutes -- no, not even four to five minutes, in
14  the period of three minutes she encountered with three
15  black men and one Native woman.
16  Q   And you're talking the three black men are yourself,
17  and George --
18  A   George and Russell.
19  Q   -- and Russell?
20  A   Yeah.
21  Q   And the Native woman was Donna?
22  A   Yeah. At 5:00 in the evening when there was over 200
23  -- in the middle of the wintertime, and there was over 200
24  people in there. It's at its most crowded. Crowded time
25  of day.

Page 25

1   Q   Do you think she was unfairly singling Donna out for
2   talking to her --
3   A   I didn't know why she was -- I didn't know why until
4   later what she was doing with Donna. You know what I'm
5   saying? All I saw was the ban paper and just
6   me reading -- I didn't get to read the ban paper. I knew
7   she said something to George. She said something to
8   Russell, and she said something to me. You know, all of
9   all these people. You know what I'm saying?
10  Q   Do you think that she was being selective -- I mean,
11  were you, Russell and George the only black people --
12  A   No, we weren't the only black people. I don't
13  believe, no.
14  Q   Do you think that she was being selective because she
15  was talking to people that Donna Edwards had talked to?
16  A   I can't -- I can't -- I can't assume why she was
17  doing what she was doing.
18  Q   So let's go back to Exhibit 3 here.
19  A   I need a break.
20      MR. NIST: Okay. Off record.
21      (Off record.)
22  BY MR. NIST:
23  Q   Getting back to Donna Edwards here, do you agree that
24  that is part of Officer Miller's role to kind of check up
25  on people who are talking to known prostitutes?

EXHIBIT ___7___
PAGE _7_ of _26_

Page 26

1   A   I don't know that Donna Edwards is a prostitute. I
2   don't -- I don't agree. I'm saying -- what I'm saying is
3   is it part of Officer Miller's job, but, you know, you can
4   only take your job so far, you know that.
5   Q   Okay.
6   A   You know what I'm saying? You don't disrespect and
7   discriminate against people because they are talking to
8   someone, you know, and especially just in passing, you
9   know. You can probably twist this and turn this any way
10   you want to, but I was disrespected.
11   Q   Okay.
12   A   Just because I was just talking to -- just because
13   Donna Edwards stopped and talked to me, that I didn't
14   deserve what happened to me.
15   Q   Okay. Do you feel differently about this case now
16   that you know that she was being banned from the bus
17   station for prostitution?
18   A   No.
19   Q   You don't?
20   A   No, because it had -- what Donna Miller [sic] did had
21   nothing to do with me. Donna Miller only talked to me,
22   for, like I said, 10 or 15 seconds.
23   Q   I'm sorry. Are you talking about Donna Edwards?
24   A   Donna Edwards. Donna Edwards. Excuse me. Donna
25   Edwards only talked to me for 10 to 15 seconds, you know.

Page 27

1   Q   So let's get back to Exhibit No. 3. If you go a few
2   lines down, it looks like she asked you again what bus you
3   were catching, and you told her bus 45. So that story is
4   the same for both you and her; is that right?
5   A   We have some discrepancies before we get to that.
6   Q   I understand that she added some stuff that you
7   disagree with before that.
8   A   Right.
9   Q   And then it says that she asked you why you had not
10   caught the last bus 45, which had only been there a few
11   minutes ago.
12   A   Right.
13   Q   Did she say that?
14   A   She did say that.
15   Q   And it says in response that you said that you don't
16   have to tell her anything, and then you called her a
17   bitch.
18   A   No. That's not what happened.
19   Q   What did happen?
20   A   I think I put all this in my -- in my -- in my
21   complaint. I put my side of the story in my complaint,
22   you know.
23   Q   Well, I understand that.
24   A   And it's like you're trying to get me to go against
25   what I said the first time, you know. I put what I --

Page 28

1   what I put down in the complaint is what I said is what
2   happened.
3   Q   I understand. I'm just trying to get very exact
4   about where you and Officer Miller disagree.
5   A   Well, it's like you're trying to cross me up and get
6   me to say something different now. You know, I'm saying
7   the same thing I did in my complaint. Go to my complaint.
8   Q   Again, we have to go through this process here.
9       So you said that -- so when you asked her
10   what -- she asked you why you hadn't caught the last bus
11   45, which had left only a few minutes ago, what did you
12   say response?
13   A   I just said it's in my complaint.
14   Q   Do you not -- do you remember now?
15   A   I'm sticking with what I have said in my complaint.
16   Q   I understand.
17   A   Okay.
18   Q   But I'm trying to figure out what you remember now.
19   A   I told you -- I remember what I said in my complaint,
20   and that's what I said, and that's what happened.
21   Q   I understand.
22   A   Okay. Yeah. You know, now, you know, you trying to,
23   you know, I know what's going on here, you know. If you
24   want to ask me anything to do with this right here, go to
25   the complaint; you'll get your answer.

Page 29

1   Q   Okay.
2   A   Okay.
3   Q   Well, again, I'm going to ask you questions.
4   A   Okay. I understand.
5   Q   You need to answer them to the best of your ability.
6   If you don't remember something, then just say you don't
7   remember. Sound good?
8   A   This is the first time I'm ever seeing this incident
9   report. I probably should have got this at the time I was
10   banned, okay. Or any time or some time after. I didn't
11   get a banned -- I didn't have no banned slip like they
12   gave Ms. Edwards here. This here -- what I have seen so
13   far here is partially true, a lot of fiction, and I really
14   need to read it thoroughly.
15   Q   Why don't you take a couple of minutes and read it?
16   A   Yeah, let me read this, because she -- not only is
17   she a bigot, she's a liar, too, you know.
18       Okay.
19   Q   Ready?
20   A   Well, everything I have underlined right there?
21   Q   Okay.
22   A   Is a lie. Okay? You can take it from there.
23   Q   All right.
24       MR. ERTISCHEK: I would like to get a copy of
25   the annotated version of Exhibit 3 or 4A.

Page 30

1    MR. NIST: Okay.
2        THE WITNESS: And anything else, you can go to
3   the report. We're wasting a lot of time here.
4   BY MR. NIST:
5   Q    I understand that's your position.
6   A    Yeah.
7   Q    For the record, when I handed you Exhibit 3, it
8   didn't have any handwritten marks on it; is that correct?
9   A    Yes, sir, that's right.
10  Q    Then you just went through and put some handwritten
11  marks on there?
12  A    Yes, I did, which means everything underlined is a
13  lie.
14  Q    Everything underlined is a lie, okay.
15  A    Yeah.
16  Q    So it says that, let's see, picking up after the bus
17  45 incident --
18  A    Except where I scribbled that out, that is...
19  Q    That's where she asked you why you had not caught the
20  last bus 45?
21  A    She did ask me that.
22  Q    You had underlined that?
23  A    But I scribbled that out because I messed up there.
24  Q    So that is true?
25  A    She asked me why I did not catch that bus, right.

Page 31

1   Q    And so then you said you don't have to -- you didn't
2   have to tell her anything, bitch; and that's a lie?
3   A    That is a lie.
4   Q    And you said instead that she needed to get the fuck
5   out of your face; is that right?
6   A    Let me see. I didn't say that until she had told me
7   to get -- she told me, you been here longer than two
8   hours.
9   Q    Okay.
10  A    Okay. You have been here over hours, catch that bus
11  there. I looked up and it was bus 2. Then she -- she was
12  saying it in a cocky manner, and her mannerism was
13  inappropriate.
14  Q    Where does bus 45 go?
15  A    Mountain View.
16  Q    And where does bus 2 go, if you know?
17  A    Out to Lake Otis and Dimond area.
18  Q    So it says, then, that she radioed Security Officer
19  Cronk to 10-5 with me, and I don't know what 10-5 means?
20  A    I don't know either. She didn't radio anybody. She
21  walked to the office, which was no more than 15 to 20 feet
22  from where we were standing, and came back with the two
23  guys.
24  Q    Two guys, two security officers?
25  A    Two security officers, right.

Page 32

1   Q    And so it says here that she told you, and you did
2   not underline this, that you do have to tell her what bus
3   you're getting, this is a transit center, which means it's
4   for transiting from one location to another, not for
5   hanging around for hours?
6   A    Right. She said that.
7   Q    She said that?
8   A    She possibly said that. I wouldn't say she lied
9   about that. She did say that.
10  Q    Was that before or after the other security guards
11  were there?
12  A    That was after the other security guards were there.
13  That's when she made that statement.
14  Q    So she went and got those two security guards?
15  A    Right.
16  Q    And brought them back to you?
17  A    Right.
18  Q    Then she said made statement?
19  A    Right.
20  Q    Then she explain to you there is a two-hour limit,
21  but that doesn't mean you can stay here for two hours
22  after missing all the bus 45s and then catch your bus?
23  A    Right.
24  Q    She said that after the two other security guards
25  were there?

Page 33

1   A    Yes.
2   Q    And it says, if your main purpose is to catch the
3   bus, catch the next one, and there is -- she said that; is
4   that correct?
5   A    She said -- she said -- she looked up and just
6   pointed at a bus, she didn't said catch the next 45.
7   Q    She just said --
8   A    She just said catch that one. She pointed at that
9   bus that was pulling up.
10  Q    And then she says that you said that you don't have
11  to say anything -- er -- I don't have to do anything you
12  say, pig bitch, this is a public place, and I can stay
13  here as long as I want, I don't have to catch the fucking
14  bus?
15  A    I never said that.
16  Q    You never said that; she's lying about that?
17  A    She's lying about that.
18  Q    Then it says that she told you she was going to get
19  her supervisor, who could talk with him?
20  A    She never said that.
21  Q    She never said that?
22  A    No. He was standing right there.
23  Q    There was two security guard officers?
24  A    Right.
25  Q    Then it says Security Officer Cronk and myself then

Page 34

1  went to the office to get Security Officer Swieter to talk
2  to Mr. Hughes. So --
3  A  They were already there. She's lying about that.
4  Q  So there wasn't a security officer there and then two
5  of them went and got another one?
6  A  What are you saying?
7  Q  Well, it says here, it looks like she was there with
8  one security officer --
9  A  No, she was there with two.
10  Q  So her and another security officer didn't leave you
11  alone to get another security officer?
12  A  No. She was there by herself at first, then she went
13  and got those other two guys.
14  Q  And both of them came at the same time?
15  A  Same time.
16  Q  It says that we returned to Mr. Hughes and asked him
17  what bus he was catching, the three of them did. Did that
18  happen?
19  A  Yeah.
20  Q  And then it says that he began to cuss loudly at us,
21  saying this is a public place and he didn't have to catch
22  a bus until he wanted to.
23  A  No.
24  Q  That's a lie?
25  A  That is a lie.

Page 35

1  Q  Were you cussing at them?
2  A  No, not until we got in the office. After I said,
3  get the fuck out of my face, that is the last time I
4  cussed at her or anybody, until they put the handcuffs on
5  me. Twisted my arm all up around my back, put the
6  handcuffs on me, and put me in the office. That's when I
7  cussed at her. I kept asking her, why am I standing here
8  in handcuffs; why the fuck am I standing here in
9  handcuffs.
10  Q  So it says that Security Officer Swieter told
11  Mr. Hughes that he had three options; he could catch the
12  next bus 45, he could leave, or they could call APD.
13  A  No.
14  Q  It looks like you only underlined about half the
15  sentence there?
16  A  Let me see. No, he told me -- he said I had to
17  leave.
18  Q  You had to leave?
19  A  They told me I had to leave right then.
20  Q  Did they tell you --
21  A  They didn't tell me I could catch the next 45; they
22  told me I had to leave right then.
23  Q  Did they say they would call APD?
24  A  No, they didn't say that right away. After they put
25  me in cuffs, they had me like I was under arrest.

Page 36

1  Q  Then it says that you started yelling, saying, arrest
2  me, arrest me and call the cops.
3  A  No.
4  Q  Did you say that?
5  A  No.
6  Q  And then it says he put -- then it says here that you
7  put your face in Security Officer Swieter's face and
8  started yelling about us being pigs?
9  A  No.
10  Q  That didn't happen?
11  A  I haven't said pigs since the '70s. No, that's a
12  lie.
13  Q  And how we were harassing him. Did you say -- you
14  underlined there that, and said that was a lie. Were you
15  not telling them that you [sic] were harassing them?
16  A  No, that's a lie.
17  Q  Did you have a conversation with Security Officer
18  Swieter and Security Officer Cronk and Security Officer
19  Miller when all three of them were there?
20  A  After, yeah, she grabbed me and put the cuffs on me
21  and took me in the office.
22  Q  Did you talk to them at all before they put the cuffs
23  on you?
24  A  Told me I had to leave.
25  Q  So --

Page 37

1  A  I said, no, I'm not leaving.
2  Q  So they came up to you and -- all three of them, they
3  just came up and said you have to leave?
4  A  Yes.
5  Q  They didn't say anything before that?
6  A  He said -- I don't know which one was Swieter or
7  Cronk. But it was the one, he was an older gentleman.
8  Q  Okay.
9  A  Okay. And he says, this is his exact words, "You
10  can't tell my officer to get the fuck out of your face,
11  you have to leave here now."
12  Q  Did you tell them that you didn't say that?
13  A  I told them I wasn't leaving, because I had no
14  reason. I hadn't been there -- I had only been there 20
15  minutes. That was my exact words I told him.
16  Q  What did he say in response?
17  A  He said -- he said something about it's not -- it's
18  not -- how did he put it? It's not a two-hours period
19  that you can stay there; if you're not doing something,
20  you're loitering, you must leave, you know, you must leave
21  now, something like that, as to imply that I was
22  loitering.
23  Q  Then, what did you say to him in response?
24  A  I remember saying to him that I had just gotten
25  there. I hadn't been there no more than 20 minutes.

**Page 38**

1  Q   And, then, what did he say after that?
2  A   Told me I had to leave.
3  Q   And then you told him again that you didn't have to
4  leave?
5  A   I told him I wasn't leaving.
6  Q   And is there anything else you remember about the
7  conversation?
8  A   After I said I wasn't leaving, the other one grabbed
9  my right arm, twisted it up behind my back, and placed a
10  cuff on it, and grabbed my other arm -- I tried to get my
11  other arm away, but he grabbed it -- they grabbed me, put
12  me in the cuffs, and after they got me in the cuffs, I
13  just walked with them.
14  Q   So they didn't warn you ahead of time they were going
15  to put you in handcuffs?
16  A   No, did not.  No.
17  Q   Let's see, it says that Security Officer Swieter told
18  you to calm down, and that's a lie, he never told you to
19  calm down?
20  A   No.
21  Q   And it says that all he had to do was catch the bus,
22  and you're saying that is a lie?
23  A   That is a lie.
24  Q   And it says that Mr. Hughes began to swing his arms
25  at us.  Do you remember if you swung your arms at them?

**Page 39**

1  A   I'm in cuffs.  How can I swing my arms at them?
2  Q   Before you were put in the handcuffs --
3  A   No, no.  That is a lie.
4  Q   Is there anything that they might have misinterpreted
5  as you swinging your arms?
6  A   No, no.
7  Q   And it says that at this point Mr. Hughes started
8  simultaneously yelling, get your hands off me, and that no
9  one was touching you at the time.  Did you ever say, get
10  your hands off me?
11  A   No.  Why would I say get your hands off me if he
12  wasn't touching me?
13  Q   After they put the handcuffs on you, did you tell him
14  to get their hands off of you?
15  A   No.
16  Q   And it says, arrest me, put me in cuffs, call the
17  cops and put me in cuffs.  You said that is a lie; is that
18  correct?
19  A   Beg your pardon?
20  Q   Sorry.  When it says here that you said, arrest me,
21  put me in cuffs --
22  A   No, that's a lie.  That's a lie.
23  Q   And then it says that they put you in handcuffs and
24  escorted you to the office, and that happened?
25  A   That happened, but it happened right away, before

**Page 40**

1  that other --
2  Q   Before that other stuff happened?
3  A   Yeah.
4  Q   So you're saying all this other stuff didn't happen,
5  but this did happen?
6  A   Yeah, they escorted me into the office.
7  Q   And it says that while he was in the office, you were
8  belligerent, that you refused to sit down, and you
9  continued to call them obscenities, and refused to let
10  your picture be taken.  That is all true?
11  A   Right.
12  Q   Do you remember what obscenities you were calling
13  them?
14  A   No, not really.  It wasn't pig.
15  Q   At one point -- it says at one point she was trying
16  to get a picture for the ban sheet.  Do you remember that?
17  A   Yeah, she was trying to get a picture of me.
18  Q   Was she successful?
19  A   I think she was, yeah.  She should have been.
20  Q   You weren't trying to keep --
21  A   I kept just turning away.
22  Q   Why did you do that?
23  A   They had no right to take my picture.
24  Q   Then it says that you turned and charged her?
25  A   No.

**Page 41**

1  Q   And you're saying that is a lie?
2  A   Yes.
3  Q   You were charged -- you never charged her?
4  A   No, I didn't charge her.
5  Q   And then it says she put her fist up to block you and
6  yelling for him to get away, you said that wasn't a lie.
7  Do you remember her putting her fist up to block herself
8  and then her yelling to get away?
9  A   No, I mean, I never charged her, so there was no
10  reason for her to put her fist up.
11  Q   And so you're disagreeing with that statement?
12  A   Right.
13  Q   And then it says Security Officer Cronk came in and
14  diverted him through the doorway and then back in the east
15  end of the office.  Do you remember Security Officer Cronk
16  grabbing you or tackling you or anything like that?
17  A   He -- they had me in the office.  He kept grabbing
18  the back of the cuffs and pulling my arms up from the
19  back.
20  Q   Okay.
21  A   He did that a few times.  Because I wouldn't sit
22  down.  They kept telling me to sit down, and I refused to
23  sit down.
24  Q   Why didn't you want to sit down?
25  A   Because I don't want to.  I didn't have to.

Case No. 3 : 05-cv-0014-jws                                    Howard Hughes

**Page 42**

1  Q   Eventually, you did sit down?
2  A   No.
3  Q   You were standing the entire time you were in the
4  office?
5  A   Yeah.
6  Q   And, let's see, he then stood behind Mr. Hughes and
7  held his arms until the police came?
8  A   Right.
9  Q   And you're saying that he held your arm the entire
10  time that you were in the office?
11  A   Right, because I wouldn't sit down.
12  Q   Was there a point where they didn't have -- where
13  they weren't holding your arms in the office?
14  A   Nope.
15  Q   So it was you, and you're having your picture;
16  taken -- or they were trying to have your picture taken --
17  A   I kept turning my head.
18  Q   You kept turning your head?
19  A   Yes.
20  Q   But the same picture will have Officer Cronk in the
21  background holding your arms?
22  A   Possibly.
23  Q   And it says that when the police came, that they
24  released you. Did that happen?
25  A   Yes.

**Page 43**

1  Q   And it says when the police arrived, he stepped out
2  of the office and walked down to the east end of the
3  lobby -- that's what Officer Miller did. She left and
4  went to the other side of the lobby and didn't return
5  until APD had removed Mr. Hughes from the premises.
6      What happened after APD came?
7  A   They uncuffed me, told me -- told me -- put me out of
8  the west-end door. Told me I was banned for 60 days from
9  the premises. That was the end.
10  Q   And in this lawsuit, are you suing APD for doing
11  anything?
12  A   No.
13      (Exhibit 4 marked.)
14  BY MR. NIST:
15  Q   Mr. Hughes, you have been handed what's been marked
16  as Exhibit 4, and have you seen this document before?
17  A   No.
18  Q   It appears to be a statement of Shaun Tebo. Do you
19  know anybody named Shawn Tebo?
20  A   No.
21  Q   I'll represent to you that he was a patron of the bus
22  system who was a witness to this incident. Why don't take
23  a minute to review this.
24  A   Okay.
25      Sounds like he was coached.

**Page 44**

1  Q   You're saying -- you just read Shaun Tebo's
2  statement?
3  A   Right. Shaun Tebo is a liar.
4  Q   He is a liar?
5  A   He was coached. Doesn't take a brain surgeon to
6  figure that out.
7  Q   Do you know why Shaun Tebo would want to make this
8  up?
9  A   I have no idea who Shaun Tebo is or why he would want
10  to make this up. I think this is -- this is a fabrication
11  just like this is (indicting).
12  Q   Were there other bus patrons around who could observe
13  what your interaction was with Officer Miller?
14  A   I mean, like I said, I knew there was at least 200
15  people in there.
16  Q   Okay.
17  A   And I was concentrating on the officers that was in
18  my face. I don't --
19  Q   You don't know who might have been listening in?
20  A   I don't know who might have been listening in.
21      (Exhibit 5 marked.)
22  BY MR. NIST:
23  Q   Mr. Hughes, you have been handed what's been marked
24  as Exhibit 5. Do you recognize this document?
25  A   No.

**Page 45**

1  Q   Well, if you turn to the last page --
2  A   This must be, yeah, okay.
3  Q   -- it looks like it has your signature on it.
4  A   Okay, yeah.
5  Q   Do you remember creating this document?
6  A   Once I read -- yeah, it's my handwriting, yeah.
7  Q   And do you remember why you created this document?
8  A   I think this might have been for -- I don't know
9  whether it was for Equal Rights office. Probably.
10  Q   You filed --
11  A   A thing with Equal Rights, sure, yeah.
12  Q   I want to be clear for the record. At some point you
13  did file a complaint with the Equal Rights Commission?
14  A   Right.
15  Q   And, let's see, is there anything in here -- I assume
16  you were trying to be truthful when you wrote this?
17  A   Right.
18  Q   Is there anything in here -- were you trying to be as
19  detailed as possible when you wrote this?
20  A   I'm sure I was.
21  Q   Why don't you turn to the top of the second page
22  there.
23  A   Uh-huh.
24  Q   And one thing that we haven't talked about is that
25  before you told Officer Miller that she needed to get the

12 (Pages 42 to 45)

7

12 of 26

Case No. 3 : 05-cv-0014-jws

Howard Hughes

**Page 46**

1  fuck out of your face, it says that she was acting stupid.
2  A   Right.
3  Q   Did you tell her she was acting stupid?
4  A   No.
5  Q   So you wrote this, but this isn't actually what you
6  said; is that correct?
7  A   Yeah, I wrote this, just to imply that she was, you
8  know, acting stupid.
9  Q   I see.
10  A   I didn't tell her she was acting stupid, no.
11  Q   Then it says here that she returned with two
12  officers --
13  A   Uh-huh.
14  Q   -- and said they were going to call the police, and
15  then it says you told them to go ahead, you're not doing
16  nothing to warrant evicting you from the public facility.
17  A   Uh-huh.
18  Q   You said that?
19  A   Right.
20  Q   And then it says that they told you to come with them
21  and you refused.  Did they tell you to come with them and
22  then you refused?
23  A   Where does it say that?
24       Yeah.  Right.
25  Q   So that is true?

**Page 47**

1  A   Right.
2  Q   At that point, they put your arms behind your back
3  and and cuffed you?
4  A   Right.
5  Q   Is that just a detail you forgot when we were talking
6  about earlier?
7  A   What?  About them?
8  Q   About them telling you to --
9  A   To come with them?
10  Q   -- come with them?
11  A   Right.  Right.
12  Q   So you forgot about that?
13  A   Yes, I did.
14  Q   And looks like this other detail you may have
15  forgotten about was that you told them that you weren't
16  doing anything to warrant getting evicted from a public
17  facility?
18  A   Right.
19  Q   If you go a little farther down, it says that after
20  10 minutes of loud arguing between you and the officers,
21  what kind of loud arguing was going on?
22  A   They were using profanities also.
23  Q   What were they saying?
24  A   We were just, you know, we were -- I mean, me and the
25  guy that had my arm behind my back, he was trying -- he

**Page 48**

1  was to trying to tell me I need to sit the fuck down and
2  all that shit.
3  Q   He was yelling that at you?
4  A   Yeah, I was yelling, and he was using the same tone
5  of voice I was.
6  Q   So you were both being equally loud?
7  A   Yes.
8  Q   He was telling you you need to sit the fuck down?
9  A   Yeah, and shut up, and all this --
10  Q   Shut up?
11  A   Just total disrespect.
12  Q   What were you telling him?
13  A   I wasn't -- I wasn't complying with anything.
14  Q   You weren't complying with anything?
15  A   No.
16  Q   As far as obscenities, what were you saying?
17  A   I kept saying -- basically, what I kept say, why the
18  fuck I standing here in handcuffs.  That was my -- that
19  was my biggest issue with all of them.  I kept saying that
20  to them.  I remember saying that to them.
21  Q   All right.  It says here that you were arguing for
22  about 10 minutes before APD arrive.
23  A   Right.
24  Q   Does that sound right?
25  A   Yeah.

**Page 49**

1  Q   And it says that the -- that there were a hundred
2  people in the building, and earlier you said that you
3  had -- that there was 200 people in the building.
4  A   That's just a guesstimate.  I mean, 5:00 in the
5  evening.
6  Q   There is a lot of people there?
7  A   A lot of people there, especially in the wintertime
8  when it's 20 or 30 below outside.
9  Q   Okay.  And it says you had seen her confront three
10  blacks and two Natives in a 20-minute period.
11  A   Right.
12  Q   And I think earlier you had said that three blacks,
13  George, Russell and yourself, and one Native --
14  A   Right.
15  Q   -- which was Donna Katie Edwards.  Who is this other
16  Native you're talking about?
17  A   I don't remember.  I don't remember.  She was walking
18  up to people, what bus are you catching, what bus are you
19  catching.
20  Q   Then it says on the third page here that you don't
21  think it's Officer Miller's job to go around harassing
22  people and that you're filing a complaint with the Equal
23  Rights Office, which you did; correct?
24  A   Uh-huh.
25  Q   And with the NAACP.  Did you do that?

Case No. 3 : 05-cv-0014-jws                                      Howard Hughes

Page 50

1   A   No.
2   Q   Why not?
3   A   I thought I would have sufficient results with the
4   Equal Rights Office.
5   Q   Did you not have sufficient results with the Equal
6   Rights Office?
7   A   No, I didn't.
8   Q   In fact, they found against you; didn't they?
9   A   Yes.  Well, yes, they did.
10  Q   Let's talk about that.
11          THE WITNESS:  I need a another break.
12          MR. NIST:  Okay.  Off record.
13          (Exhibit 6 marked.)
14          (Exhibit 3A marked.)
15          MR. NIST:  Just for the record, we cleared up a
16  little bit of paperwork in the meantime.  We had marked
17  exhibit -- put some handwritten marks on Exhibit 3, and we
18  redesignated that as Exhibit 3A, then we added another
19  Exhibit 3 that doesn't have any handwritten marks, just so
20  the record is clear.
21          THE WITNESS:  Okay.
22  BY MR. NIST:
23  Q   Mr. Hughes, you have been handed what's been marked
24  as Exhibit 6.
25  A   Uh-huh.

Page 51

1   Q   Do you recognize this document?
2   A   Yes.
3   Q   And this appears to be a determination from the Equal
4   Rights Commission; is that correct?
5   A   Right.
6   Q   Now, if would we go down to determination, it says
7   here that evidence shows that on or about January 28, 2004
8   complainant was talking to a female individual who was
9   just banned by the transit center and approached by
10  respondent's former female security officer and questioned
11  about which bus he was catching.  We have already talked
12  about that.
13          Then, going down here, it says that your
14  behavior was aggressive and that they banned you from the
15  bus station, and it says here that respondent's lieutenant
16  and its former female security officer state the
17  complainant was banned because of violence and profanity.
18          Then it says under conclusion, "Based on this
19  impartial investigation, complainant has not established a
20  substantial evidence of discrimination sufficient to
21  warrant a hearing under AMC 5.70.010."
22          Do you disagree with that?
23  A   Uh-huh.
24  Q   Is that a yes?
25  A   Yes, I disagree --

Page 52

1   Q   With the conclusions?
2   A   With the conclusion, sure.
3   Q   Do you remember the investigator in this case?
4   A   Yes.
5   Q   That was Belinda Davis, correct?
6   A   Right.
7   Q   What did Belinda Davis do wrong as part of that
8   investigation?
9   A   I don't even know what Belinda Davis did.  Took her
10  two years to do it, I know that.  It took, what, a year --
11  it was supposed to be 280 days, and it took her a year and
12  a half to -- I don't even know what she did, you know.
13  Q   So would it be correct to say that because you don't
14  know what she did, you don't know how she conducted her
15  investigation
16  A   No, I have no idea.
17  Q   Do you have any reason to believe that Belinda Davis
18  has discriminated against you in any way?
19  A   No.  I mean, to me, in my opinion, this case is just
20  cut and dried, really.  You know, what I'm saying?  You
21  know, I'm not saying Belinda Davis is discriminating, but
22  it's not out of the realm of possibility she could be part
23  of a conspiracy.
24  Q   And what would the conspiracy be, in your mind?
25  A   Let's screw Mr. Hughes.

Page 53

1   Q   Screw you how?
2   A   Well, you know, go against, I mean, in this
3   determination.
4   Q   And just for the record, Belinda Davis is black;
5   isn't she?
6   A   Yes, she is.
7   Q   Okay.
8   A   But Ms. Davis works for the Municipality.
9          (Exhibit 7 marked.)
10  BY MR. NIST:
11  Q   All right.  Mr. Hughes, you have been handed what's
12  been marked as Exhibit 7.  Do you recognize this document?
13  A   Yes.
14  Q   And what is it?
15  A   It's my complaint.
16  Q   The complaint to initiate this lawsuit; is that
17  correct?
18  A   Right.
19  Q   And how did you know to file a complaint in court to
20  initiate a lawsuit?
21  A   How did I know?
22  Q   Yeah.
23  A   I mean, I know it's my right to file a complaint, you
24  know.
25  Q   So did you look up anything first about how to file a

7

14 of 26

Page 54

1  complaint?
2  A  I had some help.
3  Q  Who helped you?
4  A  That doesn't matter.
5  Q  Well, I'm curious.  You know, you have made these
6  allegations, and I want to understand what you understood;
7  as far as making this document.
8  A  Let's just say I did it.
9  Q  You did it.  Okay.
10     I want to direct your attention to page number
11  four.
12  A  Okay.
13  Q  See down there where it says, "First cause of
14  action"?
15  A  Uh-huh.
16  Q  Okay.
17  A  Uh-huh.
18  Q  It says, "Defendants E. Miller, Purcell Security,
19  Anchorage Parking Authority and Municipality of Anchorage
20  have violated plaintiff's first amendment rights and due
21  process of law as well as the rights to the freedom of
22  speech and to peaceably assemble and equal protection
23  under the law in violation of the Alaska Constitution,
24  Article 1, Section 1."
25  A  Uh-huh.

Page 55

1  Q  First off, do you understand that you're not suing
2  Officer Miller any more?
3  A  Yeah, I understand that I filed a complaint, and I
4  couldn't find Officer Miller to subpoena Officer Miller or
5  serve Officer Miller, so.
6  Q  But you are still suing Purcell Security, Anchorage
7  Parking Authority, and Municipality of Anchorage?
8  A  Yes, I believe so, yes.
9  Q  So I'd just like to go through this and figure out
10  exactly what you're claiming everybody did.  All right?
11  A  Well, first of all, let me tell you, I was -- I'm
12  under the impression that Purcell Security is hired by
13  Anchorage Parking Authority, which is hired by
14  Municipality of Anchorage, and that's why I went through a
15  chain, like a chain of command, I guess.
16  Q  So is it fair to say, then, that what your -- these
17  allegations here, they all just revolve around because
18  each party hired the other party?
19  A  Right.
20  Q  You don't have any problem with Purcell Security
21  other than what Officer Miller did.  Does that sound
22  right?
23  A  I have a problem with Purcell Security because I
24  think Purcell Security should have been aware of what Ms.
25  Miller was doing and also her ban record was, like, off of

Page 56

1  the chain.
2  Q  You say they should have been aware of what she was
3  doing?
4  A  Yes.
5  Q  And what was she doing?
6  A  Discriminating, because her ban record for banning
7  Natives and blacks was really out of proportion with
8  anybody else on Purcell Security's payroll.
9  Q  How do you know what everybody's ban records are?
10  A  They stated in the fact-finding conference that they
11  had at the Equal Rights.  A fact-finding conference that
12  Belinda Davis had scheduled, and we all went in there.
13  Q  And are you saying that she banned more people than
14  other security guards?
15  A  More people of color.
16  Q  More people of color.  What about more people all
17  together?
18  A  I think she was there for a very short time.  You
19  know, her -- I think it was something like 132 blacks and
20  Natives and probably only a small proportion of whites.
21  Q  So she banned 132 blacks and Natives?
22  A  I'm not exactly sure of the number, but it was
23  something like that, in a short period of time.  And there
24  had been people who had been there years and didn't have
25  that kind of ban record.  I know she wasn't there that

Page 57

1  long.
2  Q  How do you know that?
3  A  Because I remember her.  I remember seeing her, you
4  know.  Like I said, I would catch the bus -- as I was
5  going to -- I was going to physical therapy every day, so
6  I would catch the bus to the training center, and then I
7  would catch another bus to my physical therapist, and I
8  would see Ms. Miller.  So that's how I knew.
9  Q  So you remember roughly when she was hired?
10  A  I don't know if that's when she was hired.
11  Q  Okay.
12  A  She could have been somewhere else working, but I
13  know -- I knew about just when she came to the transit
14  center.
15  Q  And did you understand that those statistics were
16  just people who were currently banned and not everybody
17  who had been banned for all time?
18  A  I said banned by Ms. Miller.
19  Q  Okay.  You don't know whether they were currently on
20  ban or not?
21  A  No.
22  Q  And so other than her banning 132 blacks and Natives,
23  was --
24  A  That is a rough.  I'm not sure if that was the
25  number.

Case No. 3 : 05-cv-0014-jws                                                  Howard Hughes

Page 58

1  Q   That's what you remember right now?
2  A   Yeah. Something like that.
3  Q   You didn't think any of the other Purcell officers
4  were --
5  A   No, it was stated in the conference. The other two
6  guys' ban records.
7  Q   They didn't have as many blacks and Natives?
8  A   No.
9  Q   Do you remember whether there was -- Officer Miller
10 had banned more blacks or more Natives?
11 A   Yeah, she had.
12 Q   I'm sorry. You said 132 blacks and Natives all
13 together?
14 A   Yeah.
15 Q   How many of those, roughly, were blacks and how many
16 were Natives?
17 A   I don't remember. I don't think it said that. It
18 was -- there was another officer that said it, and I can't
19 remember his name. He was -- his name was Bruce. Can't
20 remember his last name, because I kind of know him.
21 Q   You knew a security officer named Bruce?
22 A   Bruce, yeah. He was, like, one of the head guys for
23 Purcell Security. I can't remember his last name.
24 Q   So you think that Purcell Security essentially -- I
25 think what I hear you saying is that you believe that

Page 59

1  Officer Miller was discriminating against people?
2  A   Yeah.
3  Q   And you think that Purcell Security should have known
4  about it; is that correct?
5  A   Right, right. I mean, they should have -- you know,
6  an unproportionate record like that, they should have been
7  aware of it. Probably done something about it. At least,
8  you know, looked into it.
9  Q   Are you aware of anybody -- I understand that you
10 don't think you were banned for a good reason. Are you
11 aware of anybody else who you don't think has been banned
12 for a good reason?
13 A   No, I don't know of anybody else who's actually been
14 banned besides me and Donna.
15 Q   Donna Edwards?
16 A   Donna Edwards, yeah. I didn't go looking for anybody
17 else who has been banned.
18 Q   So when you say that she had banned a lot of blacks
19 and Natives, you don't know what they were banned for?
20 A   No, no, no.
21 Q   Do you think they might have been banned for a good
22 reason?
23 A   I can't -- you're asking me to assume something.
24 Q   You don't know one way or the other?
25 A   No.

Page 60

1  Q   It says -- what about the Anchorage Parking
2  Authority; what did they do wrong?
3  A   Like I said, I'm just going through a chain of
4  command.
5  Q   Because the Anchorage Parking Authority hired Purcell
6  Security?
7  A   Right.
8  Q   And, let's see, what about the Municipality of
9  Anchorage; same thing?
10 A   Same thing, yeah.
11 Q   Because they are in charge of the Anchorage Parking
12 Authority?
13 A   Right.
14 Q   Well, let's see, what did Purcell Security do to
15 violate your first amendment rights? First, which
16 amendment rights are they saying they violated?
17     I'm looking at page four of your complaint.
18 A   My first amendment rights, you say?
19 Q   I'm looking at page four.
20 A   My rights to be in a public facility.
21 Q   Your right to be in a public facility?
22 A   You know, and like I said, peaceably assemble.
23 It says freedom of speech. How did Purcell Security
24 or any of the defendants here violate --
25 A   -- that could have been a misprint.

Page 61

1  Q   Can you think of any way they violated your freedom
2  of speech sitting here today?
3  A   No.
4  Q   And, let's see, peaceably assemble. You were
5  peaceably --
6  A   Right. I was standing there by myself. Wasn't
7  bothering a sole.
8  Q   So that's what you mean when you say peaceably
9  assemble?
10 A   Right.
11 Q   You're not claiming that you had some kind of a right
12 to talk to Donna Edwards for any reason?
13 A   No. No.
14 Q   Just kind of your right to be left alone?
15 A   Right. Right.
16 Q   It says that the defendants violated your due process
17 of law. What does that mean?
18 A   Saying that they just -- they didn't give me -- they
19 didn't -- I mean, didn't give me any kind -- there was no
20 reason for me to be banned. I mean, I ain't done nothing.
21 You know what I'm saying? I'm standing by myself,
22 bothering nobody, you know. So they didn't say, you have,
23 you know, let's have a hearing or let's have anything,
24 just banned. They just said, you're just banned from the
25 building, you know.

Page 62

1  Q   You expected some kind of a hearing before you were
2  banned from the bus station?
3  A   I expected to, you know, to -- I don't think it was
4  proper for them -- for just one person to walk up to me
5  and say get out.
6  Q   Okay.
7  A   Okay. And then ban me from a public facility for 60
8  days.
9  Q   So it relates to being banned or being told to get
10 out?
11 A   Both.
12 Q   And what kind of process do you think you should have
13 had prior to that happening?
14 A   Well, I think I should have been talked to about it,
15 at least.
16 Q   You're saying -- we described pretty lengthy
17 conversations between Officer Miller and yourself.
18 A   Uh-huh.
19 Q   You're saying that conversation wasn't good enough?
20 A   That conversation was -- no. No.
21 Q   Did you -- did you try to get Purcell Security or
22 anybody else to reconsider their decision to ban you from
23 the bus station
24 A   No, no. That's why I went to the Equal Rights
25 Commission.

Page 63

1  Q   And, let's see, then it says equal protection. You
2  think the defendants violated your equal protection
3  rights. What do you mean there?
4  A   Where?
5  Q   Page four, very bottom.
6  A   Well, I'm saying to peacefully assemble and equal
7  protection under the law. I mean protection from Purcell
8  Security just walking up to me and putting handcuffs on me
9  for no reason at all.
10 Q   So it's just because that they put handcuffs on you
11 for no reason at all; there is nothing else that is
12 forming the basis for your claim for equal protection?
13 A   No -- yeah, basically that.
14 Q   Is there anything I left out?
15 A   No. I'm not sure. Okay?
16 Q   Okay.
17 A   I'm not really understanding that question, so.
18 Q   I mean, I want to make myself clear.
19 A   You do make yourself clear. What I'm saying is that
20 I should be protected under the law from the kind of
21 Gestapo tactics that they used on me.
22 Q   We have already discussed those Gestapo tactics?
23 A   Right.
24 Q   Is there anything we have missed out on?
25 A   No.

Page 64

1  Q   And then the next page says that they violated your
2  right to due process of law in violation of the
3  Constitution, Article 1, Section 7. Is that the same due
4  process thing that you were talking about previously?
5  A   Yes.
6  Q   And then, let's see, the defendants have violated the
7  plaintiff's rights to equal protection, due process under
8  Alaska Constitution, Article 1, Section 22. And have we
9  discussed that already?
10 A   Yes.
11 Q   And, let's see, then you switch from the Alaska
12 Constitution to, it looks like, the federal Constitution.
13 Is that the -- is that essentially the same thing?
14 A   Yes, essentially is.
15 Q   And again with the due process of law under the
16 federal Constitution, and that is essentially the same
17 thing?
18 A   Right.
19 Q   So your theories aren't any different depending upon
20 whether you're talking about the Alaska Constitution or
21 federal Constitution; are they?
22 A   No.
23 Q   Then we have this second cause of action of
24 conspiracy. In your own words, can you describe to me
25 what you mean by conspiracy?

Page 65

1  A   Well, there is more than one person.
2  Q   Okay. Who conspired -- what was the conspiracy?
3  A   Officer Miller and the two other officers.
4  Q   And what was the conspiracy to do?
5  A   Just what they did. Violated my human rights -- my
6  rights.
7  Q   So they were -- you're saying that Officer Miller --
8  A   She set the tone and the other two followed suit.
9  Q   Do you think they had some kind of agreement to do
10 this beforehand?
11 A   Sure. That's what a conspiracy is; right?
12 Q   That's what I'm trying to figure out, exactly what
13 you mean here.
14 A   Yeah.
15 Q   Are you aware of Officer Miller talking to these
16 other security guards about you and making any kind of
17 plan?
18 A   She -- she went to the office, yeah.
19 Q   So you're claiming that she went into the office and
20 essentially told the other -- in the office, that the
21 three of them planned some kind of agreement that they
22 were going to violate your rights?
23 A   That is not exactly what -- is not exactly what I'm
24 saying. But what I'm saying, in a nut shell --
25 Q   Okay.

Page 66

1  A   All right. They didn't just do it right when she
2  went to the office. In a nut shell, in the whole
3  perspective of it, sure they planned. It's a conspiracy
4  to violate my rights. They were on the same team.
5  Q   They all work together, is what you're saying?
6  A   Yeah.
7  Q   Are you aware of anybody outside of Purcell Security
8  who is in the conspiracy?
9  A   Now I am. Now that I read Mr. Tebo's statement,
10  sure.
11  Q   You think Mr. Tebo is a conspirator?
12  A   He has to be, because he told the same lie they told.
13  He had to be coached in saying what he said.
14  Q   Okay.
15  A   You know.
16  Q   And I take it that you didn't overhear them form this
17  conspiracy --
18  A   No, no.
19  Q   -- it's what you gather?
20  A   Is what I have, uh-huh.
21  Q   You're extrapolating that?
22  A   Yes, yes.
23  Q   Did you ever think this might be a mistake?
24  A   Not on Officer Miller's part.
25  Q   Why not?

Page 67

1  A   She knew what she was doing all the time.
2  Q   Let's kind of go back up there. From Officer
3  Miller's perspective, she had just banned somebody for
4  prostitution, and then the person who is banned for
5  prostitution didn't leave and started talking people, so
6  she was suspicious about the people she was talking to.
7  Does that sound right to you?
8  A   No. I think she pretty much knew -- she knew -- she
9  knew that Ms. Edwards was not soliciting me.
10  Q   Okay.
11  A   You know, she didn't have the time. And she was just
12  being banned. She knew that when Donna Edwards handed me
13  that paper, and I'm looking at the paper, she knew Donna
14  Edwards was not saying do I have -- to date her or have
15  sex with her for money.
16  Q   Okay.
17  A   She knew I was just reading that paper.
18  Q   Okay.
19  A   She's looking at me read the paper.
20  Q   But does it seem strange to you that Donna Edwards --
21  and you said you never met her before --
22  A   I seen her, but we never talked. We seen each other
23  quite a bit, but we never talked.
24  Q   Does it seem strange to you that she came up to you
25  and handed you this piece of paper?

Page 68

1  A   Yeah, it was strange.
2  Q   Did you understand why it might seem strange to
3  Officer Miller?
4  A   No. She doesn't know whether we know each other or
5  not.
6  Q   What are your damages in this case?
7  A   You know, it's not about the money. Like I said, my
8  prayer for relief, I would want -- basically, I would
9  want -- my -- I would be just happy with an apology and
10  not to see officer Miller in any kind of authoritive [sic]
11  position, you know. As far as public, you know, public
12  you know, in an officer's capacity: police officer,
13  security officer, anything -- anything that has to do
14  with, you know, how would you put it? Well, just in
15  authoritive positions as far as officer capacity.
16  Q   So you're saying that from your perspective, if you
17  got an apology and if Officer Miller wasn't in an
18  authority position any more, that the case would be over
19  for you?
20  A   Well, I'm not saying -- I would like -- I would like
21  to be compensated -- compensated monetarily, but it would
22  have to be reasonable.
23  Q   Well, let's go through that. What do you consider
24  reasonable compensation?
25  A   Make me on offer.

Page 69

1  Q   Well, let's kind of back up here. You were
2  unemployment at the time that this incident occurred;
3  right?
4  A   Right.
5  Q   So you're not claiming any kind of back wages or
6  anything like that?
7  A   No, no, no.
8  Q   Were you physically injured by this? Did you have to
9  go to the hospital or anything like that?
10  A   No. I was not physically injured. I was basically
11  embarrassed and, you know, belittled, you know.
12  Q   So the money here would be for your embarrassment and
13  you being belittled?
14  A   Right. And to guaranty -- I would like to see
15  Purcell Security go through their, you know, go through
16  their personnel files a little bit closer and monitor, you
17  know, what goes on with the people they hire.
18  Q   So as far as being embarrassed and belittled, will
19  you describe for me in your own words how they embarrassed
20  you.
21  A   I mean, because I know -- I know I was discriminated
22  against, and it's embarrassing being discriminated
23  against, and it hurts. It hurts deeply, you know. So I
24  think if Purcell felt the pinch, you know, maybe they
25  would take proper channels, you know, and, you know,

Case No. 3 : 05-cv-0014-jws

Howard Hughes

Page 70

1    probably look a little bit closer on who they hire and
2    what procedures they take.
3    Q    So when you're saying embarrassed, this didn't -- it
4    isn't something like somebody you know saw this happen and
5    that's what you find embarrassing?
6    A    Anybody.  Anybody who saw it.
7    Q    Anybody who saw it?
8    A    Yeah, I don't have to know them.
9    Q    And you're saying that you were belittled.  Is that
10   essentially the same thing?
11   A    Yes.
12   Q    And refresh my recollection, you can't identify
13   anybody who knew you at the bus station at the time that
14   you were arrested?
15   A    I only know first names.  I know the George guy.
16   Russell Dunkin.  And the -- Donna, I always thought her
17   name was Diane.  And I didn't know her last name until
18   just now.
19   Q    But Donna -- and Donna and Russell had both left by
20   the time --
21   A    They were standing outside.  They saw the whole
22   thing.  They were standing right outside the door.  They
23   saw it.
24   Q    And what about George; was he still in the bus
25   station?

Page 71

1    A    Yes, he was still in the bus station.
2    Q    You have been arrested a bunch of times; is that
3    correct?
4    A    Why would you say that?
5    Q    I mean, if it's not true --
6    A    Why would you say that?
7    Q    I'm suppose to ask questions; you're suppose to
8    answer them.
9    A    Yeah.  I say, why would you say that?  Are you
10   assuming?
11   Q    Well, I mean, you know, we can go through it, if you
12   want.
13   A    You looked at my record?
14   Q    Well, why don't we get this marked.
15   A    Yes or no?
16   Q    The problem here, Mr. Hughes, is I can't be the one
17   to testify here today.  You're the only one.
18        (Exhibit 8 marked.)
19   BY MR. NIST:
20   Q    Mr. Hughes, you have been handed what's been marked
21   as Exhibit 8.
22   A    Uh-huh.
23   Q    And I'll represent to you that this is a computer
24   printout from the state of Alaska court documents.
25   A    Okay.

Page 72

1    Q    And it says that -- lists of a variety of matters, a
2    handful of civil matters and some criminal matters.
3    A    Civil; what would be civil?
4    Q    Well, if you look at the first two pages, everything
5    ending in a CR, I'll represent to you, is a criminal
6    matter.
7    A    Okay.  You said civil.
8    Q    No.  The ones ending in CI are civil matters.
9    A    Okay.
10   Q    Are you with me so far?
11   A    Uh-huh.
12   Q    How many times would you say you have been arrested
13   in your life?
14   A    I don't know.
15   Q    Can you give me a rough estimate?
16   A    No.
17   Q    Would it be over 10, under 10?
18   A    Over 10.
19   Q    Over 10?
20   A    Yes.
21   Q    And has this generally happened when you have been
22   around people you know?
23   A    I don't know.
24   Q    Have you ever been handcuffed before?
25   A    Yes.

Page 73

1    Q    And can you give me a rough order of magnitude?
2    A    Beg your pardon?
3    Q    I said, can you tell me roughly about how many times
4    you have been put in handcuffs?
5    A    No.
6    Q    Would it be over 10, under 10?
7    A    Over 10.
8    Q    What about -- do you think it would be over, like,
9    25?
10   A    I don't know.
11   Q    Would it be somewhere around there, you think?
12   A    Could be.
13   Q    Have you ever -- do you feel like any of those
14   approximately 25 times or so that you have been in
15   handcuffs that you were discriminated against?
16   A    Few times I feel, maybe.
17   Q    And did you sue anybody as a result of that?
18   A    No.
19   Q    And why not?
20   A    Probably because it wasn't as blatant as this
21   incident was.
22   Q    This incident seems different in your mind?
23   A    Right.
24   Q    And the 25 times that you have been arrested, had you
25   done something wrong?

**Page 74**

1  A  I don't know.
2  Q  But this time, as I understand it, your contention is
3  that you didn't do anything wrong and you were arrested
4  and you didn't think that was right?
5  A  Right.
6  Q  And have you ever been arrested for or convicted of a
7  felony before?
8  A  Yes.
9  Q  When was that?
10  A  1989.
11  Q  What for?
12  A  Strong-arm robbery.
13  Q  Strong-arm robbery?
14  A  Right.
15  Q  Been convicted of any other felonies?
16  A  No.
17  Q  That's the only one?
18  A  Yup.
19  Q  And when we met last time, you were in a halfway
20  house?
21  A  Right.
22  Q  And what was that for?
23  A  Driving with no license.
24  Q  Is that the first time that you have been in a
25  halfway house?

**Page 75**

1  A  No.
2  Q  How many other times have you been in a halfway
3  house?
4  A  I don't know.
5  Q  Would it be over 10, under 10?
6  A  I'm not sure.
7  Q  You can't say one way or the other?
8  A  I don't think I have been in a halfway house 10
9  times, no. I don't think I have, but I'm not sure. Could
10  be close.
11  Q  What about jail, generally? Can you tell me how many
12  times you have been in there?
13  A  No, I don't know how many times.
14  Q  Would you say that it's --
15  A  Over 10.
16  Q  Over 10?
17  A  Yeah, yeah.
18  Q  Would it be over 25 or less than 25?
19  A  Probably over 25.
20  Q  When you go to jail, can you give me about how long
21  you usually spend there?
22  A  Longest time I have ever been in my jail in my life
23  was 11 months.
24  Q  Does that relate to the strong-arm robbery?
25  A  Right.

**Page 76**

1  Q  These 25 or so times that you have been arrested, did
2  you find it more or less embarrassing than what happened
3  at the bus station?
4  A  Less embarrassing.
5  Q  And why is that?
6  A  That is just my opinion.
7  Q  Just kind of a gut reaction?
8  A  I had never been roughed up like that. I mean, for
9  nothing, you know. That is basically, you know, my
10  feelings on this case: I did nothing to warrant the
11  treatment that I received.
12  Q  Other than being embarrassed and belittled, is there
13  anything else you want money for in this case?
14  A  No, not really.
15  Q  Do you understand that under Alaska law, you're
16  liable for a portion of the attorney's fees for the
17  Municipality and Purcell Security if you lose this case?
18  A  Yup.
19      MR. NIST: I don't think I have any further
20  questions. Now Mr. Ertischek gets to ask you a few.
21      THE WITNESS: Okay.
22          EXAMINATION
23  BY MR. ERTISCHEK:
24  Q  Mr. Hughes, my name is Mark Ertischek. I'm an
25  assistant municipal attorney. I represent the

**Page 77**

1  Municipality of Anchorage.
2  A  Right.
3  Q  The Parking Authority is one of Mr. Nist's clients in
4  this matter.
5  A  Okay.
6  Q  With regard to your arrest record, were any of the
7  arrests -- did any of these arrests take place in settings
8  where there were other persons around to observe when you
9  were arrested?
10  A  In all my arrests?
11  Q  Yeah.
12  A  Probably. Probably yes.
13  Q  In your arrest record, did you have any arrests in
14  which you were later convicted for assault?
15  A  Yes.
16  Q  Did any of those involve assaults on women?
17  A  No. I don't believe so. I never assaulted -- well,
18  I have no domestic violence. No, I don't think I have
19  ever, no.
20  Q  Have you ever been convicted of stalking?
21  A  No.
22  Q  Earlier you were asked about the complaint and
23  whether you consulted with a lawyer about it. I just want
24  to understand your answer. Did you draft this complaint
25  yourself?

7
20 of 26

Case No. 3 : 05-cv-0014-jws                                    Howard Hughes

Page 78

1    A    Yes.
2    Q    And just generally, you understand that you're
3    testifying under oath?
4    A    Yes.
5    Q    This is not the first time you have been testifying
6    under oath?
7    A    No.
8    Q    So you have testified in all of these previous
9    criminal matters, and there are a couple of civil listed
10   in the courts, and so you've had an opportunity in the
11   past to be advised about your obligations as a witness
12   when you testify under oath?
13   A    Uh-huh.
14   Q    If this case goes to trial, do you plan to try your
15   the case yourself or do you have a lawyer who's going to
16   come in and try the case for you?
17   A    I'm not really sure yet. I was hoping it wouldn't go
18   to trial, basically. I really was.
19   Q    Have you consulted a lawyer about coming in to try
20   the case for you?
21   A    Yes, I have.
22   Q    Who is that lawyer?
23   A    I consulted -- I can't remember his name. I really
24   can't. I know where his office is. I was referred to him
25   by somebody else, a friend that I went to school with, and

Page 79

1    he referred me to this guy, and he was kind of tied up at
2    this time -- at that time, you know.
3    Q    You don't remember his name?
4    A    I can't remember his name. I really can't. I was
5    referred to him by a good friend I went to junior high and
6    high school with by the name of Brent Cole.
7    Q    Who?
8    A    Brent Cole.
9    Q    Does Mr. Cole live in Anchorage?
10   A    Yes, he does.
11   Q    And did the lawyer you consulted with live in
12   Anchorage?
13   A    Yes.
14   Q    And was that the lawyer who gave you some advise
15   about how to draft this complaint?
16   A    No.
17   Q    Did you see another lawyer about it?
18   A    I had a guy who's kind of a paralegal, I guess. He
19   is a jail-house lawyer.
20   Q    Was he in jail at the time you consulted him?
21   A    No, no. Just somebody I knew.
22   Q    Did he take a fee for giving you assistance?
23   A    No, no.
24   Q    Did you promise him a portion of whatever you could
25   get in this case?

Page 80

1    A    No, no.
2    Q    Did -- well, you know, after you filed this case, I'm
3    sure you received a copy of the initial order from the
4    judge in which he set the dates at which various parties
5    were to do things and get the case ready for trial. One
6    of the things that parties are supposed to do is file
7    initial disclosures. Did anyone ever talk to you about
8    your obligation to file initial disclosures?
9    A    No.
10   Q    Well, one of the things you do in initial disclosures
11   is identify witnesses that might have knowledge about the
12   case.
13   A    Yeah.
14   Q    So I would like you to think very carefully and
15   identify for me right now everyone you can think of who
16   has or might have knowledge or evidence about this case,
17   and just to simplify it, we have already talked about
18   Donna Edwards and Russell and the other individual you
19   identified as George.
20   A    Right.
21   Q    And the various Purcell Security people and Mr. Tebo.
22   So anybody else?
23   A    That's it. And I don't know who Mr. Tebo is, so I
24   can't, you know....
25   Q    Have you talked to anybody who you are going to call

Page 81

1    as a witness to testify if this case goes to trial?
2    A    No.
3    Q    Is there anybody else you can think of that you might
4    want to call as a witness?
5    A    No.
6    Q    What about with regard to your damage claim; you
7    asked for $250,000 for pain and suffering from Purcell
8    Security, from Officer Miller and from the Anchorage
9    Parking Authority. Who do you plan to call as a witness
10   to testify as to your pain and suffering?
11   A    Myself.
12   Q    Anybody else?
13   A    Possibly the same people that I have already stated.
14   Q    Have you consulted any medical professionals or
15   mental health practitioners to get their assistance in
16   dealing with your pain and suffering?
17   A    No, no.
18   Q    Could you describe for me whether there is any other
19   aspect to your suffering other than the embarrassment at
20   being cuffed that you described earlier?
21   A    No.
22   Q    So this whole case is about the cuffing?
23   A    About the abuse. It was not only the cuffing; it was
24   the way they cuffed. You know, twisting my arms around,
25   you know, and embarrassing me in front of, you know, a

21 of 26

Case No. 3 : 05-cv-0014-jws                                    Howard Hughes

Page 82

1  whole public building of people.
2  Q   And the persons who did this were the three Purcell
3  Security Guards?
4  A   That is correct.
5  Q   And there is no question in your mind that these were
6  not employees of the Anchorage Police Department?
7  A   No.
8  Q   You have testified that you have no problem with the
9  Anchorage Police Department in regard to this?
10 A   No, no.
11 Q   So the officer who eventually came and told you to
12 leave the building didn't do anything wrong, in your view?
13 A   No. He back up what they said.
14 Q   He just said leave?
15 A   Leave.
16 Q   And you left?
17 A   Right.  Because he was a police officer.
18 Q   And you were not actually arrested by the police
19 officer?
20 A   No.
21 Q   You asked separately for compensatory damages against
22 the Municipality of Anchorage.  What are the compensatory
23 damages you want?
24 A   As I said, I just went through, like, chain of
25 command type thing, and there is a page missing.

Page 83

1  Q   Is there a page missing?  My pages are all numbered.
2  A   No, it's not.  No, it's not.
3      As I said, I asked for the compensatory damages
4  against all defendants.  Okay?
5  Q   When you say "compensatory damages" in here, what do
6  you understand that to mean?
7  A   Compensation for my, you know, my embarrassment and
8  belittlement.
9  Q   Now, exactly -- let me withdraw that.  If I
10 understand you correctly, there was no person that you
11 know to be employed by the Municipality of Anchorage that
12 caused any embarrassment to you?
13 A   Right.
14 Q   And that the Municipality of Anchorage is named as a
15 defendant in this matter purely because you understand
16 that they hired the Parking Authority?
17 A   Right.
18 Q   And that the Parking Authority hired Purcell and
19 Purcell hired the three security guards?
20 A   Right.
21 Q   And I know that you're not a lawyer.
22 A   Right.
23 Q   And so would I be correct in assuming that you did
24 not personally look at the records that would describe the
25 nature of the Parking Authority as an organization and

Page 84

1  reach your own independent conclusion that that was
2  actually a relation in which the Municipality hired the
3  Parking Authority?
4  A   Yeah, but I believe within that chain of people, the
5  Municipality, Parking Authority, Purcell Security, they
6  should look at sometime or another the people that are
7  representing them and reflecting, you know, reflecting
8  their record.  You know what I'm saying?
9  Q   I think I understand that.  But I just want to make
10 sure that I do understand whether or not you know that the
11 Anchorage Parking Authority is an independent body, it's
12 not a part of the Municipality?
13 A   All right.  Well, see, maybe I didn't.  Maybe I was
14 wrong in doing that.
15 Q   And you probably would not be aware that the
16 Municipality does not actually hire the Anchorage Parking
17 Authority?
18 A   Right.  If that's so, then I wasn't aware.  I was
19 told that the Municipality hired Anchorage Parking
20 Authority which hired Purcell Security, and if that is
21 incorrect, then I'm incorrect.
22 Q   And if the facts actually turn out to be that the
23 Municipality of Anchorage did not hire the Anchorage
24 Parking Authority, would you then agree that the
25 Municipality of Anchorage is not a proper defendant in

Page 85

1  this suit?
2  A   Of course.  I would have to.
3  Q   Now, as to the conspiracy, if I understand your
4  testimony correctly, it is your belief that three persons
5  participated in a conspiracy to violate your rights and
6  those three persons are Officers Miller, Swieter and
7  Cronk?
8  A   Right.  But, then, on the other hand, like I said, I
9  wouldn't leave -- I won't -- in the conspiracy, I wouldn't
10 leave Belinda Davis out, who isn't -- but I'm not bringing
11 suit on the Municipality because of the findings of the
12 Equal Rights Commission, but I did state earlier that if
13 there is a conspiracy, you know.
14 Q   What evidence, if any, do you have --
15 A   None.  I'll let you finish the question.  I'm sorry.
16 Q   -- that there was any communication between Belinda
17 Davis and Officers Miller, Swieter and Cronk prior to the
18 day on which you were cuffed?
19 A   None, none.
20 Q   Do you have any evidence that there was any
21 communication between Mr. Tebo and Officers Miller,
22 Swieter and Cronk --
23 A   None, no.  I have no idea who Tebo is.
24 Q   With regard to just Miller, Swieter and Cronk, do you
25 have any evidence suggesting that they had any discussions

22 (Pages 82 to 85)

Case No. 3 : 05-cv-0014-jws                                          Howard Hughes

Page 86

1   regarding you prior to this incident?
2   A   No.
3   Q   So, then, the entire conspiracy theory that you have
4   is that when Miller went and said, I want to get my two
5   superior officers, who were Cronk and Swieter, and they
6   came out, that amounted to a conspiracy?
7   A   Right.
8   Q   And it was just the fact that they came out together;
9   that is the only evidence you're aware of of a conspiracy?
10  A   Exactly.
11  Q   With regard to the discrimination claim that you
12  filed, did you have a chance to read the discrimination
13  determination that's been marked as Exhibit 6?  When it
14  was issued to you, did you sit down and read it?
15  A   Read this here (indicating)?
16  Q   Yeah.
17  A   I read it.  It was mailed to me.  Yes, I read it.
18  Q   And did you meet with Belinda Davis?  Did she
19  personally give it to you?
20  A   No, she mailed it.  I appealed it, and they
21  reconsidered, and then I lost again on reconsideration.
22  Q   So you did exercise a right to apply for
23  reconsideration?
24  A   Right.  I sure did.
25  Q   And your request for reconsideration was denied?

Page 87

1   A   Well, it was reconsidered, but then --
2   Q   But then ultimately they denied?
3   A   Yeah, yeah.
4   Q   At that point in time, were you ever made aware that
5   you had a right to appeal the denial to the Superior
6   Court?
7   A   No, I wasn't.
8        Excuse me.  I need another break.
9        MR. ERTISCHEK:  Sure.
10       (Off record.)
11  BY MR. ERTISCHEK:
12  Q   But you didn't file an appeal?
13  A   No, I wasn't -- no, I don't think -- I did -- that
14  was an appeal I did file.
15  Q   You filed a request for reconsideration, but if I'm
16  correct, you did not file an administrative appeal to the
17  Superior Court?
18  A   No, I did not.
19  Q   If I understand correctly, you stated earlier you
20  never sued anyone before for violation of your rights or
21  for discriminating against you because of your race?
22  A   No, I didn't sue anyone, no.
23  Q   Have you filed any earlier administrative
24  proceedings?
25  A   I think I had one with a Pinkerton officer one time.

Page 88

1   I had -- I filed with the Equal Rights before on a
2   Pinkerton officer.  Basically, almost the same thing, kind
3   of like, you know.
4   Q   About when did that take place?
5   A   I'm not sure.  It was years back.
6   Q   And was that also at the Transit Authority?
7   A   Yes, it was.
8   Q   And could you just describe for me to the best of
9   your recollection what the facts were?
10  A   I really don't remember what it was about.  I really
11  don't.
12  Q   Had you been banned by the Transit Authority?
13  A   Did I -- I don't remember.  I can't recall.
14  Q   What was the result of your complaint?
15  A   Pretty much the same as this one here.
16  Q   Have you ever filed any complaint with the state
17  Human Rights Commission?
18  A   No.
19  Q   Have you ever been banned from the Transit Authority
20  before?
21  A   I think so.  Once before, yes.
22  Q   About when --
23  A   I can't remember what year it was.  It was -- I think
24  it was in the '90s sometime.
25  Q   Was this a 60-day ban?

Page 89

1   A   I don't remember.  I don't remember.
2   Q   Aside from being -- do you remember why you were
3   banned on that occasion?
4   A   No, I don't remember.
5   Q   Was it for being loud or using offensive language?
6   A   I don't recall.  It's been quite sometime.
7   Q   Other than bans, have you ever been expelled or
8   ordered to leave a public building?
9   A   No.
10  Q   Have you ever been ordered to leave one of the buses?
11  A   No.
12  Q   Have you ever been a defendant in a civil suit?
13  A   No.
14  Q   I note that there are a number of cases listed
15  here --
16  A   Right.
17  Q   -- that have civil case numbers.
18  A   I don't know what those are about.  I have no idea.
19  That's why I was asking him earlier.  CI, right?
20  Q   Yes.
21  A   Six of them.  I have no idea what they are.
22  Q   It could be debt collection actions or something like
23  that?
24  A   Right, could be.
25  Q   Well, if you can't recall.  Now, if I understand your

23 (Pages 86 to 89)

Page 90

1  earlier testimony, you don't have a problem with the rules
2  of conduct that, you know, were covered in what's been
3  marked as Exhibit 2?
4  A   Right.
5  Q   And so the idea of asking someone to leave the
6  Transit Center premises because they were swearing, using
7  sexually explicit or abusive language, being loud or
8  discourteous, that is not a problem, you just don't feel
9  that you were being loud or discourteous or violating that
10 rule --
11 A   Right.
12 Q   -- on this occasion?
13 A   Exactly.
14 Q   And as to Ms. Edwards, you really don't know whether
15 or not she was engaging in any criminal activity?
16 A   No, I don't.
17 Q   So you know that she was -- the banning papers said
18 she had been seen soliciting, but you don't have any
19 personal knowledge that she was --
20 A   I didn't even get to read the ban.  All I saw -- it
21 had a picture, her picture.  It had banned over her
22 picture, and I never got to read what it was about.
23 Because she -- Officer Miller came right to us, and as
24 soon as she came to us and told the woman she had to
25 leave, I handed her the paper right back.

Page 91

1  Q   But just as a general matter, you would not disagree
2  that if someone was engaging in solicitation for
3  prostitution, that it would be correct for that person to
4  be expelled from the Transit Center?
5  A   Yes, absolutely.  Of course it would be correct.
6  Q   And you don't know, of course, that Ms.Edwards was
7  engaging in prostitution, but you also have no knowledge
8  from personal knowledge, at least, that she was not?
9  A   Right.
10 Q   You really don't know what knowledge Ms. Miller had
11 about Ms. Edwards?
12 A   All I know is that Ms. Miller asked this guy, George,
13 did she solicit him, and told her no.
14 Q   Then George left?
15 A   George went to another part of the building, yes, but
16 she still took Ms. Edwards into the office.
17 Q   But you have no idea whether she had any personal
18 knowledge --
19 A   No.
20 Q   -- of Ms. Edwards from her earlier time?
21 A   No.  And I only know -- only reason I know that
22 George said no, I mean, George told her no is because he
23 told me, and it was after they had went into the office.
24 Q   If you were working as a security guard and the rules
25 you were supposed to enforce said that someone who was

Page 92

1  engaging in prostitution should be asked to leave the
2  premises, if you saw a known prostitute talking with
3  patrons, would you think it would be reasonable for you to
4  have gone up and asked them if they were being solicited?
5  A   Yes.
6  Q   Now, you mentioned a couple of times that when this
7  incident occurred there was a large number of people in
8  the Transit Center?
9  A   Yes, there was.
10 Q   And at various times, you said 200, and there was a
11 document that said 100, but you don't really know exactly
12 how many?
13 A   No, no.
14 Q   Just a lot?
15 A   Yeah, a lot.  An awful lot.
16 Q   And you didn't really know anybody there except for
17 Russell, George and this woman, Ms. Edwards?
18 A   You mean, in that immediate area?
19 Q   In that immediate area?
20 A   Yeah.
21 Q   On this occasion, did you observe that there were any
22 patrons other than necessarily in your area immediate who
23 were persons of color:  Alaska Natives, American Indians,
24 blacks?
25 A   No, I didn't observe any other -- I know that, like I

Page 93

1  say, it was like 5:00 in the evening.  A lot of people
2  were getting off work.  It was just people in and out the
3  doors, you know.  People coming and going, you know, and
4  that's -- I just remember -- what I remember is Officer
5  Miller within a short period of time approaching four or
6  five people and none of them were white.
7  Q   But you couldn't say at this point whether everyone
8  she approach was a person who Ms. Edwards approached?
9  A   No. No. Ms. Edwards hadn't approached them.  I only
10 saw Ms. Edwards -- I saw her talk to the one guy, that was
11 George, the guy George.  When she came out of the little
12 office, she stopped and talked to me.  She stopped and
13 said, hey, look what they just did, and handed me the
14 paper.  I looked at the paper, and before I could get --
15 after I read the ban and seeing the picture, before I
16 could read what it said, Officer Miller was right there.
17 Q   Was right there?
18 A   Yeah.
19 Q   Aside from George at this point, do you feel that you
20 can honestly tell me that with regard to the other
21 individuals that she spoke to that none of them had spoken
22 with Ms. Edwards before Ms. Miller spoke to them?
23 A   No.
24 Q   You couldn't say one way or the other?
25 A   Right.  Well, I couldn't say she didn't.  She didn't

24 (Pages 90 to 93)

**Page 94**

1  -- she didn't speak to Russell. Ms. Edwards didn't speak
2  to Russell, and I think the other person I was referring
3  to, the other Native person, I don't think Ms. Edwards
4  talked to her.
5  Q   Had you been looking at that individual the whole
6  time you were there?
7  A   Which individual? Ms. Edwards?
8  Q   You said the other person, you said, that Ms. Miller
9  spoke with?
10 A   Right, right. I don't even remember who it was, but
11 I remember it was a Native guy.
12 Q   And are you telling me that you were watching that
13 person the whole time they were there, and you're quite
14 sure that Ms. Edwards never spoke to them?
15 A   I was watching Ms. Miller. No, I can't say Ms.
16 Edwards did not speak to that person.
17 Q   Mr. Hughes, I presume you know that Ms. Miller was
18 never an employee of the Municipality of Anchorage?
19 A   Right.
20 Q   And I don't know, but you may know now that Ms.
21 Miller is no longer employed by Purcell Security?
22 A   Right.
23 Q   I'm sure you're aware that she's not been employed by
24 Purcell Security for some amount of time now?
25 A   Right.

**Page 95**

1  Q   Let me take a quick look here. I guess just one
2  final question.
3       You mentioned a number of times that you're
4  taking medications now.
5  A   Right.
6  Q   I don't want to get into your medical history, but
7  are you taking any medications that may have an effect on
8  your ability to remember things?
9  A   No, no. Just high blood pressure medication. No,
10 no.
11      MR. ERTISCHEK: Thank you. I have no other
12 questions.
13      MR. NIST: I just a have a couple follow up.
14      FURTHER EXAMINATION
15 BY MR. NIST:
16 Q   Previously Mr. Ertischek had talked to you about
17 initial disclosures, and one of the things there is you
18 identify people who might know something about this case.
19 Another thing that you do as part of that is to get
20 together any documents that you're going to use or you
21 think that might be relevant to this case.
22      Have you gone through that exercise?
23 A   No, I haven't.
24 Q   Sitting here today, can you think of any document
25 that may be relevant to this case?

**Page 96**

1  A   No, not that I have.
2  Q   So when you go to court, you don't expect to bring
3  any documents with you; is that correct?
4  A   I expect to bring the truth with me.
5  Q   But you -- is the truth you're just planning to get
6  up and tell your side of the story to the jury?
7  A   Right.
8  Q   To make this case a little simpler, as I understand
9  it, you're contending that Officer Miller was a racist; is
10 that right?
11 A   Right. Not was, she is.
12 Q   And is -- would it be fair that what this lawsuit is
13 all about is that you think that she stopped you because
14 you're black?
15 A   Exactly. I think she not only stopped me, the way
16 she treated me was because I'm black.
17 Q   The way she treated you?
18 A   Right.
19 Q   So other than her treating you poorly because you're
20 black, is there anything else? Is that really what this
21 case is all about?
22 A   Yeah, yeah.
23 Q   So this case is essentially, if she treated you badly
24 because you were black or not; is that right?
25 A   Yeah.

**Page 97**

1       MR. NIST: I don't have any further questions.
2       MR. ERTISCHEK: I don't have anything further
3  either. I guess normally you'd have a lawyer who can ask
4  his own questions. Did you want to say anything?
5       THE WITNESS: I'd like to see this go away. I
6  really would. But if persisting in a trial, then I might,
7  you know, I might go and hire a lawyer. Or somebody that
8  knows, you know, knows a little bit more about the legal
9  system than I do, but I would like, you know, if anybody
10 would like to make an offer, a reasonable offer with
11 regard to what I said?
12      MR. ERTISCHEK: I think certainly we're not
13 going to discuss that on the record of the deposition.
14      THE WITNESS: Yeah, all right. That's the only
15 thing I have.
16      MR. NIST: Okay. Why don't we go off record.
17      (Proceedings adjourned at 12:00 p.m.)

Case No. 3 : 05-cv-0014-jws                                    Howard Hughes

Page 98

```
1        C E R T I F I C A T E
2        I hereby certify that I have read the foregoing
3   transcript and accept it as true and correct, with the
4   following exceptions:
5   ═══════════════════════════════════════════════════
6   PAGE   LINE   CORRECTION
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18
19  _____   _____
    Date:  5/4/06    Howard Hughes
20
21      (Use additional paper to note corrections as
    needed, signing and dating each page.)      (SW)
22
23
24
25
```

Page 99

```
1           REPORTER'S CERTIFICATE
2        I, SUSAN J. WARNICK, RPR, and Notary Public in
3   and for the State of Alaska do hereby certify:
4        That the witness in the foregoing proceedings was
5   duly sworn; that the proceedings were then taken before me
6   at the time and place herein set forth; that the testimony
7   and proceedings were reported stenographically by me and
8   later transcribed under my direction by computer
9   transcription; that the foregoing is a true record of the
10  testimony and proceedings taken at that time; and that I
11  am not a party to nor have I any interest in the outcome
12  of the action herein contained.
13       IN WITNESS WHEREOF, I have hereunto subscribed my
14  hand and affixed my seal this _____ day of _____
15  2006.
16
17
18  _____
            SUSAN J. WARNICK,
            Registered Professional Reporter
19          Notary Public for Alaska
20
    My Commission Expires:  April 8, 2010
21
22
23
24
25
```

Page 100

```
1           INDEX TO DEPOSITION
2   WITNESS:  Howard Hughes              PAGE
3   Examination by Mr. Nist:             3
    Examination by Mr. Ertischek:        76
4   Further examination by Mr. Nist:     95
5
6   EXHIBIT                        PAGE
7   No. 1                          12
    No. 2                          14
8   No. 3                          17
    No. 3A                         50
9   No. 4                          43
    No. 5                          44
10  No. 6                          50
    No. 7                          53
11  No. 8                          71
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```